# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NADIA SHERRIS, | ) |
| Plaintiff, | ) ) ) No. 15 C 9078 |
| v. | ) ) Judge Jorge L. Alonso |
| CITY COLLEGES OF CHICAGO, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Nadia Sherris, sues defendant, City Colleges of Chicago, her former employer, for hostile work environment based on sexual harassment and retaliation under Title VII, 42 U.S.C. §§ 2000e *et seq.* This case is before the Court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion.

## BACKGROUND

Defendant is a community college system comprised of seven colleges in Chicago. (Pl.'s LR 56.1 Resp. ¶ 2, ECF No. 24.) Plaintiff worked as a catering manager in defendant's Business Enterprises department, which was responsible for defendant's revenue-generating businesses, including cafeteria services, three cafes, and two restaurants. (*Id.* ¶¶ 11, 19.) The food-service elements of the Business Enterprises Department were intertwined with the Washburne Culinary Institute ("Washburne"), a culinary school within defendant's Kennedy-King College. (*Id.* ¶¶ 12, 14.) Plaintiff reported to Jose Cervantes, who supervised various operations of Washburne and the Business Enterprises Department, particularly its cafes and restaurants, at five or six different locations. (*Id.* ¶ 14.) Cervantes reported to Joyce Carson, Vice Chancellor of Business

Enterprises. (*Id.* ¶ 13.) Cervantes did not have the authority to hire, fire, demote, transfer or discipline plaintiff, reassign her with significantly different responsibilities, or change her benefits. (*Id.* ¶ 20.)

Plaintiff began employment with defendant in January 2014. (*Id.* ¶ 19.) She came to be employed there after Cervantes, a neighborhood acquaintance, told her of the opportunity and encouraged her to apply. (Pl.'s Dep. at 21:22-23:3, ECF No. 23-6.) Plaintiff interviewed with Carson and subsequently received a job offer via defendant's Office of Human Resources. (*Id.* at 24:18-26:1.) According to plaintiff, Cervantes had bragged that he and Carson were friends. (*Id.* at 220:18-221:9.)

In mid-February 2014, Cervantes began sexually harassing plaintiff, groping her on a number of occasions and making repeated sexual advances. (Pl.'s LR 56.1 Resp. ¶ 22; Pl.'s Dep. Ex. 6, Pl.'s City Colleges of Chicago Discrimination and Harassment Complaint Form at 2, ECF No. 23-7 at 15.) Carson heard that there was "tension" between plaintiff and Cervantes, so on or shortly before March 10, 2014, she called plaintiff to ask her about it. (Pl.'s LR 56.1 Resp. ¶ 25.) Plaintiff told Carson that Cervantes had been making advances that made her uncomfortable. (*Id.* ¶ 25.) Carson encouraged her to file a written complaint with the Equal Employment Opportunity ("EEO") Officer in the Office of Human Resources. (*Id.*; *see id.* ¶¶ 5-7 (under defendant's EEO policy, which prohibits sexual harassment and retaliation, EEO officer is responsible for investigating any complaints, which must be in writing).) Plaintiff responded that she would think about whether to do that; she was "nervous" about doing so because she did not want to "cause troubles" or "lose [her] job," which Cervantes had helped her to get. (Pl.'s Dep. at 99:1-23, ECF No. 23-6.) Additionally, she thought the problem might "just go away" because Cervantes frequently told her, "okay, I'll stop[,] I promise I'll leave you alone," and also

that he was going to retire from City Colleges of Chicago and start his own business soon, so she would only have to "put up with this for another month." (Pl.'s Dep. at 99:23-100:8, ECF No. 23-6.) Carson told plaintiff that, regardless of whether plaintiff chose to file a written complaint, Carson would have to report the issue, and on March 10, 2014, Carson sent a memo to Stephanie Tomino, defendant's Vice Chancellor of Human Resources, informing her that "Nadia Sherris has made allegations of improper advances by a senior member of the Washburne team" and asking her to "[k]indly take action, as appropriate." (Pl.'s LR 56.1 Resp. ¶¶ 16, 26.)

Plaintiff received a letter, dated March 10, 2014, from Aaron Allen, defendant's Director of Labor Relations, informing plaintiff, "The EEO Office for the City Colleges of Chicago . . . became aware that you may have been subjected to conduct in violation of the City Colleges of Chicago EEO Policy. You have the option of filing a written complaint if you would like to initiate an investigation of the incident(s)." (*Id.* ¶ 27.) The letter enclosed a copy of the EEO policy as well as a complaint form. (*Id.*) Leah DeVita, a Labor and Employment Specialist and one of the investigators who worked with Allen, called plaintiff to follow up with her. (*Id.* ¶¶ 16, 28.) However, plaintiff did not immediately file a written complaint because Cervantes "had at that point told everybody he's . . . going to retire. He is starting his own company. So I thought he was just going to go away." (Pl.'s Dep. at 102:3-6.)

Carson instructed Cervantes that he was not to be alone with plaintiff or to "treat her in any way that would be considered problematic." (Pl.'s LR 56.1 Resp. ¶ 32.) Cervantes was to spend more time at work sites where he was less likely to be near plaintiff, and Carson began handling some of Cervantes's management duties herself to allow Cervantes to "step[] back from . . . certain things," in anticipation of a potential investigation into his behavior. (*Id.* ¶¶ 32, 40; Carson Dep. at 73:9-10, ECF NO. 23-4.)

According to plaintiff, "nothing changed" immediately after her March 10, 2014 conversation with Carson, in terms of Cervantes curtailing his contact with plaintiff and his harassing behavior toward her. (Pl.'s Dep. at 107:1-108-23.) To the contrary, it seemed to plaintiff that the way Cervantes and his friend Angel Cruz, Washburne's executive chef, treated her took a turn for the worse. (Pl.'s LR 56.1 Resp. ¶ 30.) They had previously been supportive of her, but they began to "throw [plaintiff] under the bus." (*Id.*) Plaintiff testified that, although she could only remember one specific phone conversation and one email, she believed that she occasionally reached out to Carson to ask her to "come and visit here and see what's going on" (Pl.'s Dep. at 112:4-5), *i.e.*, to see the way Cervantes and Cruz were treating her, because she was "feel[ing] like things [were] starting to get weird" (*id.* at 115:15), but Carson only reiterated that plaintiff should follow up with the EEO office for support (*id.* at 112:15-17, 116:17-18). (*See* Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶ 12, ECF No. 27.)

On March 14, 2014, a dispute involving plaintiff arose over preparations for a catering event. At 11:00 a.m., in the midst of the dispute, plaintiff emailed Cruz, "And tell god damned Emanuel to pick up his phone if he is with you that little lazy next to being fired whiny brat—I have so had it." (Pl.'s Dep. Ex. 10, ECF No. 23-7 at 26.) At 11:17 a.m., plaintiff emailed Carson, "Please call me. I think he knows I'm filing now because both Angel and Jose are giving me grief beyond normal. I cannot work in this environment." (Pl.'s LR 56.1 Resp. ¶ 29.) Carson, having received plaintiff's 11:00 a.m. email to Cruz unbeknownst to plaintiff, emailed plaintiff and Cruz, with Cervantes copied, "This is not the way we communicate with ANYONE!!! We need to have a team sit-down next week." (Pl.'s Dep. Ex. 10, ECF No. 23-7 at 26.) Carson called Cruz to ask about the situation, and after Cruz explained that "there was something needed for [the] event that [plaintiff] wasn't being responsive too," Carson instructed

Cruz to put his requests to plaintiff in writing from that point forward. (Pl.'s LR 56.1 Resp. ¶ 31.) At her deposition, plaintiff admitted that she used inappropriate language, although she claimed that such language was common in defendant's kitchens and among the catering or kitchen staff. (*Id.* ¶ 41.)

On March 15, 2014, Cruz emailed Carson to report plaintiff's behavior at the preceding evening's event:

> I'm sorry to bother you with this email but I just wanted to let you know what happened last night at the event. . . . Nadia continued provoking me calling me all kinds of names in front of the staff, I was not argumentative I did not say a word and I walked away from the situation. She called me an animal a joker, she told the staff that I needed an audience, she tried to fire Emmanuel for a mistake at the end of the night she admitted she had made, . . . she was completely out of control. Three employees and one student witnessed the incident; Kyle, Brenda Williams, Rosita and Cheyenne Toney. Jose was also there and he saw how she treated me in front of the staff yesterday.

(*Id.* ¶ 42.) At her deposition, plaintiff admitted to calling Cruz an animal and a joker and testified that she called Cruz names "in the heat of the moment" because she was "upset." (*Id.*) On March 25, 2014, based on the report of the incident involving Emmanuel, Carson sent an email to plaintiff, Cruz, Cervantes, and other management and human resources personnel, stating, "It has come to my attention that an employee was told he was fired Friday, March 14, 2014. No one at City Colleges has the authority to fire anyone on the spot. If an employee's behavior is unacceptable you may release him/her from the event and document the situation for review and discussion with Human Resources." (*Id.* ¶ 46; *see* Pl.'s Dep. at 156:7-157:6.)

On March 25, 2014, plaintiff submitted a written EEO complaint against Cervantes to defendant's EEO office. (Pl.'s LR 56.1 Resp. ¶ 33.) At that point, plaintiff testified, Cervantes's harassment "stopped, thankfully." (Pl.'s Dep. at 108:23; *see id.* at 109:1-18.) Allen initiated an investigation, interviewing several employees in addition to plaintiff and Cervantes, and on April

10, 2014, he sent an eight-page report to Tomino, informing her that the investigation "found that there is insufficient evidence to find that . . . Cervantes subjected . . . [plaintiff] to sexual harassment." (Pl.'s LR 56.1 Resp. ¶ 34.) The report explained that the investigation had uncovered no witnesses to the alleged harassment and no basis to believe that either Cervantes or plaintiff was more credible than the other, so it could not sustain the allegations, although it was clear that Cervantes had "exhibited poor judgment" by "blurring professional boundaries." (Pl.'s Dep. Ex. 8 at 7-8, ECF No. 23-7 at 23-24.) On the following day, Cervantes submitted a letter to Carson in which he tendered his resignation, effective May 9, 2014, in order to start his own business, although he assured Carson, "Your support has always been appreciated and reporting to you has been one of the best parts of working for City Colleges." (Pl.'s LR 56.1 Resp. ¶ 36; Pl.'s Stmt. of Add'l Facts ¶ 24.)

On April 10, 2014, Margaret Black, who managed one of Washburne's cafes, sent an email to Carson, Cruz, and Cervantes describing a phone call she had received from plaintiff:

> I just got a call from Nadia stating that she wants me to come . . . to inventory all the items that are there for the Café. As in a previous email the Chef made it clear that he would take care of the things for the café, because we do not have the space for all the items here. I told Nadia that we order in small amounts and on a as[-]needed basis, she informed me that it is my respons[ibility] as a manager to know what inventory I have. I again tried to explain to her that the Chef and I had it under control, she informed me she does not care, she would not let me talk and just kept going off. I hung up on her, I had customers and I am not going to argue with her.

(*Id.* ¶ 47; Pl.'s Dep. Ex. 14, ECF No. 23-7 at 32.) At her deposition, plaintiff explained that she was merely trying to ask Black to do inventory to clear some storage space, but she admitted that she was not Black's supervisor and she should have asked a supervisor to handle the matter. (Pl.'s Dep. at 161:20-162:23.)

6

On April 11, 2014, Cervantes emailed Carson, "I received a call this past Monday from Cordell Stewart who is the Regional Manager for the . . . Chicago Park District. Andrea Adams let him listen to Nadia Sherris' voice mail message and Cordell wanted to know if we were working on problems with this employee. He was considering notifying his Risk Management team at headquarters." (Pl.'s Dep. Ex. 15, ECF No. 23-7 at 33.) At her deposition, plaintiff explained that the voice mail that the email described pertained to an incident that occurred at some time before April 7, 2014, on a night when plaintiff was working late at the South Shore Cultural Center, a Chicago Park District facility in which Washburne rented space for a restaurant, kitchen, and offices. (Pl.'s Dep at 164:9-165:11, *see also id.* at 40:15-41:17.) At that time, plaintiff would come into the office in the evenings and at night, sometimes until 1:00 a.m., rather than work there during the daylight hours, when she risked running into Cervantes and Cruz. (*Id.* at 165:2-11.) On the night in question, she fell asleep working at a conference table. (*Id.* at 165:12-15.) A security guard in plain clothes, whom plaintiff did not know, "scream[ed]" at her to wake her and eject her from the building, frightening her. (*Id.* at 165:16-166:1.) Plaintiff called Andrea Adams, who managed the building, and left her a voice mail about the incident. (*Id.* at 166:2-167:2.) At her deposition she admitted that she had "not realiz[ed] the time" when she called Adams's cell phone at that late hour, and she "probably sounded strange" and "real garbled" in her voice mail message. (*Id.* at 166:8-13.)

On April 25, 2014, plaintiff sent an email to a client at Daley College, apologizing for slowness in setting up for an event and blaming it on "severe understaff[ing]." (Pl.'s Dep. Ex. 18, ECF No. 23-7 at 36.) The message was forwarded to Carson, who responded to plaintiff, "Nadia, I will not tolerate you sending excuses like this to our internal or external clients. I asked if you were ready for this event and you confirmed that you were. I personally told you

that you would be given the resources you needed to make this event successful, so I am quite displeased that you sent this to our internal team." (*Id.*)

Jori Orsini, an assistant dean at Washburne, reported to Carson that she had "overheard a conversation that Nadia had with a customer which did not reflect well on the Washburne brand." (Pl.'s LR 56.1 Resp. ¶ 50.) According to Orsini, plaintiff was "mainly . . . complaining to the guest about having to do [an] event. The event was at the Willis Tower. Through the conversation, Nadia sounded like she was trying to get them to unbook the event(s) and was speaking about it not being worth their time to do the event because they were not making enough money on it." (*Id.*) At her deposition, plaintiff explained that she was merely trying to explain to the client that the amount it wanted to spend was not enough to cover the costs of the event, and she thinks Orsini may not have heard the full conversation. (Pl.'s Dep. at 174:8-23.)

Carson received at least two reports that plaintiff was drinking alcohol at catering events. (Pl.'s LR 56.1 Resp. ¶ 51.) According to the reports, on at least two occasions plaintiff offered liquor or wine to employees, telling them it was okay to taste wine so they knew what they were offering their guests, and she poured some for herself. (*Id.* ¶¶ 51-52.) One employee reported that plaintiff would fill a cup with wine, put it to the side, and drink from the cup throughout the evening, refilling it as needed. (*Id.* ¶ 52.) Plaintiff admits tasting wine "with permission pursuant to her tasting duties in the catering department," but denies that her drinking amounted to more than that. (*Id.* ¶¶ 51-52.) Carson investigated the reports by asking other employees who worked these events what they saw, and she testified that what she learned "substantiated" the allegations that plaintiff was drinking at events she was working. (Carson Dep. at 89:4-90:18.)

On April 30, 2014, in a letter signed by Tomino, defendant notified plaintiff that it had accepted a recommendation to terminate her employment. (Pl.'s LR 56.1 Resp. ¶ 55.) Carson had made the recommendation based on the "reports of unprofessional behavior," which included "drinking during an event that she was managing, . . . telling our clients that we're not capable of managing our events, behavior leading to stress with our landlord, among . . . a list of smaller things that were going on as well." (Carson Dep. at 116:4-117:6.)

Although she is unaware of any other employees who behaved similarly but were not discharged, plaintiff believes that she was generally "singled out" and treated differently than other employees, given that defendant seemed to tolerate similar behavior in others. (Pl.'s LR 56.1 Resp. ¶ 54.) Plaintiff filed a charge of discrimination with the Equal Opportunity Employment Commission, and after receiving a right-to-sue letter, plaintiff filed this lawsuit. (*Id.* ¶¶ 56-57.)

## **ANALYSIS**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court must view all evidence and draw all inferences in favor of the non-moving party. *See Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). At this stage, the court may not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th

Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

Defendant moves for summary judgment on plaintiff's claims of hostile work environment based on sexual harassment and retaliation under Title VII.

## I. HOSTILE WORK ENVIRONMENT

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer may be liable for discrimination, within the meaning of Title VII, if an employee is subject to a hostile work environment based on any of the characteristics enumerated by the statute. *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). To prevail on a hostile work environment claim, the employee must show that (1) she was subject to unwelcome harassment, (2) the harassment was based on a protected characteristic, (3) the harassment was so severe and pervasive as to alter the conditions of the employee's environment and create a hostile or abusive working environment, and (4) there is a basis for employer liability, such as knowledge or participation by supervisors. *Id.*

For purposes of its motion for summary judgment, defendant does not dispute that there is evidence that plaintiff was (1) subject to unwelcome harassment, (2) based on sex, (3) that was sufficiently severe and pervasive to create a hostile work environment. Defendant moves for summary judgment on plaintiff's hostile work environment claim based on the fourth element, whether there is a basis for employer liability.

The standard for imputing liability for workplace harassment to an employer depends on whether the harasser is a supervisor. For purposes of Title VII, a "supervisor" is not someone who merely exercises some control or direction over the work the plaintiff performs on a daily basis; a Title VII "supervisor" is someone whom the employer has "empowered . . . to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). If the harasser is a supervisor, then the employer is strictly liable for the harassment, unless it can establish that it did not take any tangible employment action against the plaintiff, it took reasonable care to prevent or correct harassment, and the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id.* at 2439. If the alleged harasser is a mere co-worker, then the employer is only liable if it was negligent in controlling working conditions. *Id.*

Cervantes was not plaintiff's supervisor for Title VII purposes. Plaintiff has adduced no evidence that Cervantes was empowered to take tangible employment actions against her. (*See, e.g.,* Pl.'s LR 56.1 Resp. ¶ 20.) True, plaintiff reported to Cervantes and worked under his direction, but it is precisely that definition of "supervisor," *i.e.* one who exercises control over an employee's day-to-day work, that the United States Supreme Court rejected as too broad in *Vance*, 133 S. Ct. at 2443, in favor of a definition based on power to take tangible employment actions. Plaintiff half-heartedly argues that Cervantes must have been empowered to take tangible employment actions against her because he did exactly that by "pull[ing] his support" from her after her March 10 complaint of harassment and instead "throwing her under the bus"

when problems arose. (Pl.'s LR 56.1 Resp. ¶ 30.) But plaintiff cites no authority to support her contention that holding an employee responsible for problems instead of acting as a supportive "protector" or "guide" (*id.*) is a "significant change in employment status" that amounts to a tangible employment action, nor does it even vaguely resemble any of the examples of tangible employment actions, such as hiring, firing, etc., enumerated in *Vance*. *See id.* at 2442 (citing *Ellerth*, 524 U.S. at 761-62).

Thus, defendant is only liable for Cervantes's sexual harassment of plaintiff if it was "'negligent either in discovering or remedying the harassment.'" *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016) (quoting *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004)). To avoid liability for workplace harassment under a negligence standard, an employer must take "'prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring'" upon receiving notice of the harassment. *Cole*, 838 F.3d at 898 (quoting *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009)).

In this case, upon hearing of the tension between plaintiff and Cervantes, Carson reached out to plaintiff, on her own initiative, to inquire about their relationship. Plaintiff told Carson that Cervantes had been making advances that made her uncomfortable. Carson told plaintiff to file an EEO complaint, and Carson also immediately notified Tomino herself, which led to Allen sending a letter and a copy of the EEO complaint form to plaintiff the very same day. According to plaintiff, she reiterated to Carson in the ensuing days or weeks that Cervantes and Cruz were "giving [her] grief," having perhaps heard that she had complained to Carson, and Carson reiterated to plaintiff that she should follow up with the EEO office. Plaintiff testified that at or around the time she submitted a written EEO complaint, even before the investigation began and before Cervantes resigned, the harassment stopped.

"There is no question that a stoppage of harassment shows [the] effectiveness" of an employer's corrective action. *Porter*, 576 F.3d at 637. Plaintiff suggests that defendant should have taken additional actions such as disciplining Cervantes or going to greater lengths to separate Cervantes and plaintiff from each other, but "[w]hatever reasons there might be for the company's failure to take additional steps . . . are irrelevant absent evidence suggesting that the [action the company took] was not reasonably likely to prevent the harassment from recurring." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993). In this case, it was apparently the mere threat of an imminent EEO investigation that stopped the harassment from recurring, and the cessation of the harassment shows the effectiveness of the corrective action.

But plaintiff argues that defendant was negligent nevertheless because it did not take corrective action promptly enough. Plaintiff testified that the harassment continued between March 10, 2014, the date of plaintiff's initial verbal complaint to Carson, and March 25, 2014, the date she filed her written EEO complaint, and that plaintiff told Carson during that time frame that she was having problems with Cruz and Cervantes, but Carson only told her to follow up with the EEO office. According to plaintiff, Carson's failure to take some further action to protect her from harassment was unreasonable. Defendant argues that plaintiff knew she had only to file a written EEO complaint, and the "'inevitable unpleasantness'" of lodging a formal complaint of sexual harassment "'cannot excuse the employee from using the company's complaint mechanisms.'" (Def.'s Mem. at 10, ECF No. 22 (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999).)

Generally, "[a]n employer is not liable for co-employee sexual harassment when a mechanism to report the harassment exists, but the victim fails to utilize it." *Durkin v. City of Chi.*, 341 F.3d 606, 612-13 (7th Cir. 2003). But it does not necessarily follow that an employer

13

who has received notice of harassment outside of its formal reporting mechanisms has no duty to act. *See Phelan v. Cook Cty.*, 463 F.3d 773, 786 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *Hicks v. Sheahan*, No. 03 C 0327, 2004 WL 3119016, at *16 (N.D. Ill. Dec. 20, 2004) ("*Durkin* . . . does not categorically hold that notice *must* be given through the precise channel outlined by the employer."). The Court assumes that, by notifying Carson, plaintiff put defendant on notice that Cervantes was making improper advances toward plaintiff.

Nevertheless, "the law against sexual harassment is not self-enforcing," *Perry v. Harris Chernin, Inc*., 126 F.3d 1010, 1014-15 (7th Cir. 1997), and while a plaintiff has no "duty under the law to complain about discriminatory harassment . . . [or] to cooperate with the employer's investigation," the "reasonableness of the employer's attempts to rectify harassment is measured against how much it knows or should have known," which is likely to depend on how forthcoming the plaintiff has been. A plaintiff claiming that her employer was negligent in redressing her complaint of sexual harassment can only prevail if she discharged her own "duty to reasonably 'avail herself of the employer's preventive or remedial apparatus,'" *Porter*, 576 F.3d at 637-38 (internal quotation altered) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998)), because, as the Supreme Court has explained (by way of the Seventh Circuit),

> Title VII "borrows from tort law the avoidable consequences doctrine under which victims have a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute." *Penn. State Police v. Suders*, 542 U.S. 129, 146 (2004) (citations and quotation marks omitted). *See also Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) (discussing a Title VII plaintiff's responsibility to mitigate damages). "If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care." *Faragher*, 524 U.S. at 807.

*Porter*, 576 F.3d at 637-38 (internal citations altered). Plaintiff admitted at her deposition that she delayed submitting a written complaint, although she received a written complaint form from

14

the EEO office promptly after reporting Cervantes's harassment to Carson, because she believed Cervantes was on the verge of retiring to start his own company and she "thought he was just going to go away." (Pl.'s Dep. at 102:3-6.) According to plaintiff, Carson repeatedly told her that if Cervantes was making unwelcome advances, she should submit a written complaint to the EEO office. To the extent plaintiff complains of harassment between March 10, 2014 and March 25, 2014, this case falls within the category of cases in which the employer took reasonable care to set up mechanisms for reporting and correcting sexual harassment, and the victim unreasonably failed to use these mechanisms to avoid the harm of which she complains. *See Porter*, 576 F.3d at 637-38 (citing *Suders*, 542 U.S. at 146, and *Faragher*, 524 U.S. at 807).

To be sure, Carson was not entitled to ignore plaintiff merely because she had relayed to Tomino plaintiff's complaint that a co-employee was making "improper advances" toward her. "[A]n employer [has not] necessarily fulfill[ed] its responsibility to take appropriate corrective action if it has reported an incident to some other party"; rather, "[i]n some cases—perhaps many cases—turning a matter over to someone else and taking no further action may not be enough." *Cole*, 838 F.3d at 898. But based on the evidence in this case, the Court fails to see any point at which Carson acted so unreasonably that a reasonable juror could conclude that defendant shirked its responsibility to take "appropriate corrective action." Plaintiff told Carson that Cervantes was making "advances" that made her uncomfortable, but there is no evidence that plaintiff provided notice at any point prior to March 25, 2014, of harassment that "[rose] to the level . . . that would have required . . . drastic action, such as same-day investigation and termination" of Cervantes. *Milligan v. Bd. of Trs. of. S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012) (citing *Jackson v. Cty. of Racine*, 474 F.3d 493, 501-02 (7th Cir. 2007) (holding that an employer did not act unreasonably where it had notice of sexual harassment, but took no action

15

for three months because no victim wished to lodge a formal complaint); *see also Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 957-60 (8th Cir. 2005) (where (1) plaintiff's direct supervisor took no action in response to plaintiff's initial complaint of improper advances; (2) investigation initiated by higher-level supervisor did not begin until two weeks after plaintiff's initial complaint, did not conclude until eight weeks later, and ultimately was inconclusive; but (3) there was "no further harassment during the investigation period" or afterward; employer's response, "though perhaps not model," met its burden to take prompt and effective action). Based on what Carson knew, she was not required to "prevent all contact between" plaintiff and Cervantes based on the verbal complaint plaintiff made to Carson. *Milligan*, 686 F.3d at 385.

The Court might reach a different conclusion if, for example, the evidence showed that plaintiff told Carson that Cervantes was continually threatening or assaulting her, but plaintiff has not adduced evidence that Carson knew more than that (1) Cervantes had made improper advances toward plaintiff and (2) Cervantes and Cruz were giving plaintiff "grief beyond normal," *i.e.*, that they were in frequent, heated disputes over operations or work performance issues. Carson addressed the former by notifying Tomino and encouraging plaintiff to file a written complaint in accord with defendant's EEO policy, and the Court fails to see why Title VII required her to do more based on the latter, given that "Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Defendant's investigation was sufficiently swift and effective to discharge defendant's burden of taking prompt and appropriate corrective action. Defendant's motion for summary judgment is granted on plaintiff's sexual harassment claim.

## II. RETALIATION

In addition to prohibiting certain unlawful employment practices in 42 U.S.C. § 2000e-2(a), as described above, Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C.A. § 2000e-3(a). This type of discrimination is commonly known as "retaliation." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The plaintiff must show that the protected complaints were a but-for cause of the adverse action by the employer, although they need not be the only cause. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). "[T]he appropriate question on summary judgment is simply: could a reasonable jury find based on *all* available evidence that a . . . retaliatory motive caused [plaintiff's] termination?" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017); *see Ortiz*, 834 F.3d at 764 ("[T]he sole question that matters [is] [w]hether a reasonable juror could conclude that [plaintiff] would have kept [her] job if [she had not complained of sexual harassment,] and everything else had been the same.").

Plaintiff was fired approximately seven weeks after her initial, verbal complaint of sexual harassment, and approximately five weeks after submitting her written complaint. She claims that the timing is suspicious because, just after she complained to Carson about Cervantes's harassment, Carson began papering plaintiff's file with purported evidence of unprofessional

behavior, although she had not previously been disciplined, nor had anyone previously raised any issues with her work performance.

Evidence of suspicious timing is generally insufficient to permit a plaintiff to survive summary judgment on the issue of causation unless it "follows on the close heels of protected expression." *Lord*, 839 F.3d at 564 (termination two days after protected expression was sufficiently suspicious, unless other evidence showed that plaintiff would have been terminated anyway). The Seventh Circuit has explained that "an interval of a few weeks or even months may provide probative evidence of the required causal nexus," although such a long interval is likely to be sufficiently suspicious to defeat summary judgment only if there is other evidence corroborating the retaliatory motive. *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012).

In this case, the only other evidence plaintiff adduces in support of her retaliation claim is evidence that, according to plaintiff, defendant generally tolerated in others the purportedly "unprofessional" conduct for which she was terminated, so a juror could reasonably conclude that it was a pretext for retaliation. Relatedly, according to plaintiff, Cervantes and Carson were friends, so Carson—who recommended plaintiff's termination—had a particular motive to retaliate against plaintiff for her accusations against him.

But plaintiff cites no examples of other employees who were guilty of the same "unprofessional" conduct for which plaintiff was terminated but who kept their jobs, nor is there any other evidence that "calls . . . into question" the reasons Carson gave for plaintiff's termination. *Lord*, 839 F.3d at 564. As the Seventh Circuit has explained,

> "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos* [*v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)] (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). We have repeatedly emphasized that when "assessing a plaintiff's claim that an employer's explanation is pretextual, we do not . . . second-guess[] an employer's

18

> facially legitimate business decisions." *Id*. (internal quotation marks omitted). An employer's reasons for firing an employee can be "foolish or trivial or even baseless," as long as they are "honestly believed." *Culver* [*v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)] (quoting *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997)).

*Lord*, 839 F.3d at 564. As in *Lord*, rather than "casting doubt on the sincerity" of defendant's reasons for firing her, plaintiff "merely quibbles with the wisdom of [her] employer's decision." *Id.* This is "exactly the type of personnel management decision[] that federal courts do not second-guess." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017). "Federal courts intervene in these sorts of personnel disputes 'only where an employer's reason for [an adverse action] is without factual basis or is completely unreasonable.'" *Nicholson v. City of Peoria, Ill.*, 860 F.3d 520, 524 (7th Cir. 2017) (quoting *Burton*, 851 F.3d at 698). Plaintiff does not dispute that she did the things for which Carson recommended firing her, nor does she dispute, for the most part, that she was wrong to do them. Her contention is essentially just that defendant should not have fired her for doing them—but whether termination was "wise or warranted is beside the point." *Lord*, 839 F.3d at 565. What matters is not the correctness of defendant's judgment in that regard, but whether that was sincerely its judgment, as opposed to a pretext for retaliation. *See Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) ("It is . . . possible that [defendant] punished [plaintiff] too harshly . . . . But this court does not act as a superpersonnel department." (internal quotation marks omitted)); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 883 (7th Cir. 2016) ("[Defendant] concluded . . . that [plaintiff's] interpersonal issues were a problem for the company. The record does not suggest that [defendant's] rationale was insincere or pretextual, and we do not sit as a superpersonnel department that judges the wisdom of defendant's decisions." (internal quotation marks and alterations omitted)). There is no evidence, such as evidence that similarly situated employees

19

were known to have engaged in the same behavior but not discharged, that Carson did not honestly believe that plaintiff's behavior was so unprofessional that it warranted termination, and this Court does not second-guess that decision.

As for plaintiff's assertion that Carson had a retaliatory motive because Carson and Cervantes were friends, it is not nearly enough to get plaintiff over the summary judgment hurdle. This assertion appears to be based on little more than Cervantes's bragging that he could use his influence with Carson to help plaintiff get a job offer (Pl.'s Dep. at 220:18-221:9) and on Cervantes's thanking Carson for her support in his resignation letter (Pl.'s Stmt. of Add'l Facts ¶ 24). That there was any close relationship between Carson and Cervantes that might bias Carson against plaintiff or motivate Carson to retaliate against plaintiff on Cervantes's behalf appears to be a matter of pure "speculation," which "will not withstand summary judgment." *Argyropoulos*, 539 F.3d at 736-37 (citing *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[S]ummary judgment is the put up or shut up moment in a lawsuit," and a mere "hunch about the defendant's motives . . . will not survive a motion for summary judgment." (internal quotation marks omitted)).

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment [21] is granted. Civil case terminated.

**SO ORDERED**                                                        **ENTERED:** February 21, 2018

                                                                                                            **HON. JORGE L. ALONSO**
                                                                                                             **United States District Judge**